**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Augusta, Georgia
*By cburke at 2:42 pm, Feb 01, 2019*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| | ) | Number <u>14-12297</u> |
| SCIENCE FITNESS, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| EVANS PLAZA PARTNERS, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | Number <u>16-01035</u> |
| JOY R. WEBSTER, TRUSTEE | ) | |
| EVANS FITNESS CLUB EXPRESS, LLC, | ) | |
| | ) | |
| Defendants | ) | |

<u>**OPINION AND ORDER**</u>

Before the Court is the complaint filed by Evans Plaza Partners, LLC ("Landlord") against Evans Fitness Club Express, LLC ("Express") alleging Express improperly removed property belonging to Landlord. Trial was held to determine ownership of the

property.[1]  This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A), (N), and (O) and the Court has jurisdiction pursuant to 28 U.S.C. §1334.  For the following reasons, the Court finds the lockers, the mirrors in the New Addition (defined below), and the nonmovable sink belong to the Landlord; and the Remaining Mirrors (defined below), freestanding sink, and T.V. stands belong to Express.

## FINDINGS OF FACT

In order to fully address the issues before the Court, an understanding of the chain of title prior to Science Fitness, LLC ("Debtor") becoming a tenant of Landlord is helpful:

Prior to this bankruptcy case, Pro Fit Management, Inc. ("Pro Fit") operated a health and fitness club as a tenant under a master lease.  In 2003, Pro Fit executed an asset purchase agreement with GH Evans, LLC ("GH Evans") with GH Evans assuming the lease of Pro Fit.  Def. Ex. 1.  In connection with this sale, GH Evans purchased all of Pro Fit's:

> right, title and interest in, to and under the assets, properties, improvements and business owned, held or used in the conduct of the Business by [Pro Fit] as same are constituted on the Closing Date including . . . all other personal property and interests therein,

---

[1] By agreement of the parties, the trial was bifurcated with a trial on damages to be held separately.

2

> including gym equipment, machinery, equipment,
> computers, furniture, fixtures, vehicles and
> other tangible property owned or leased by [Pro
> Fit] and utilized in the operation of the
> Business . . . .

Def. Ex. 1.

Thereafter in 2004, Landlord purchased the shopping center where GH Evans was already a tenant. Tr. 33:15-18. In 2005, Landlord entered into a new lease with GH Evans. Pl. Ex. 1. Then, in 2011, Debtor purchased the assets of GH Evans and assumed the lease with Landlord (the "Lease"). Def. Ex. 2; Pl. Exs. 2 and 3. Thereafter, Debtor experienced financial difficulties and filed its chapter 11 bankruptcy petition in 2014, which was subsequently converted to a chapter 7 in 2016. The Chapter 7 Trustee ("Trustee") sought to sell "substantially all of [Debtor's] assets" to Express for $405,900.00 and Landlord planned to rent the space to another entity. Pl. Ex. 5.

In connection with the sale, the Trustee and Express executed the Asset Purchase Agreement ("APA") which defines "Acquired Assets" as Debtor's right, title, and interest in the following:

> all accounts, contract rights, membership
> agreements, personal training contracts,
> contracts and all accounts receivable through
> ABC Financial and Clubready, furniture,
> furnishings, equipment, inventory, intellectual
> property required for the operation of the

3

> Debtor's business, goods held for sale,
> supplies and other materials used or consumed
> in the Debtor's business. A copy of the
> equipment list is attached and incorporated
> into this Agreement.

Pl.'s Ex. 5. The equipment list attachment to the APA entitled "Equipment List 2016" lists various exercise equipment such as treadmills, ellipticals, weights, bikes, and segregates some items by their location within the gym using the subheadings "office," "conference room," "kids klub," and "lobby area." Id. These items include desks, tables, chairs, cabinets, printers, a refrigerator, and microwaves. Id. "Excluded Assets" are defined as "[a]ny asset of the Debtor not defined in Acquired Assets" and are not included in the sale. Id. In connection with the sale, the Trustee executed a Bill of Sale conveying to Express:

> all accounts, contract rights, membership
> agreements, personal training contracts,
> contracts and all accounts receivable through
> ABC Financial and Clubready, furniture,
> furnishings, equipment, inventory, intellectual
> property required for the operation of the
> Debtor's business, goods held for sale,
> supplies and other materials used or consumed
> in the Debtor's business. A copy of the
> equipment list is attached as Exhibit "A" and
> incorporated into this Final Closing Statement.

Pl. Ex. 6. This Exhibit A is identical to the APA "Equipment List 2016."

After the sale was consummated, Express began removing

4

assets from the premises.  Landlord promptly informed the Trustee that Express was improperly removing fixtures from the premises-- mirrors glued to the walls and lockers affixed to the walls.  In response, the Trustee notified Express the mirrors and lockers were not included in the sale and their removal was not authorized by the APA.  The Trustee also filed an adversary proceeding against Express seeking: a declaratory judgment that certain items be declared excluded from the sale; and such items be returned or replaced to the Landlord's satisfaction; and for the Court to enjoin Express from removing such items.  Webster v. Express, Ch. 7 Case No. 14-12297, Adv. Proceeding No. 16-01034, Dckt. No. 1 (Bankr. S.D. Ga. Sept. 29, 2016).

The Court granted the Trustee's motion for a temporary restraining order stopping Express from removing any additional items from the premises.  Webster v. Express, Ch. 7 Case No. 14-12297, Adv. Proceeding No. 16-01034, Dckt. No. 6 (Bankr. S.D. Ga. Sept. 29, 2016).  Also, on the same day, Landlord filed this adversary proceeding against the Trustee[2] and Express.  In these two proceedings, the Court has previously entered orders: enjoining Express from removing additional items; requiring the parties to

---

[2] Summary judgment was granted to the Trustee, Joy R. Webster, and the parties agreed she was no longer a party to this adversary. Dckt. No. 92.

5

identify the specific items in dispute; and requiring the storage of the disputed items pending resolution of the adversary proceeding. Dckt. Nos. 10 and 15. At trial, the parties stipulated that the only remaining disputed items are the lockers, mirrors, T.V. stands, and two sinks ("Disputed Items").[3] Tr. 17:16-25:8.

Express contends the Disputed Items are assets it acquired under the APA because they are trade fixtures. Conversely, Landlord contends the Disputed Items were not included in the assets Express acquired because Debtor never had an ownership interest in these items.

Landlord cites provisions from the Lease concerning fixtures, improvements and removal. The Lease states:

> Except for signs, merchandise counters or other easily removable similar trade fixtures installed by Tenant at Tenant's expense, all alterations, decorations, additions and improvements made by Tenant to the Leased Premises and including all heating and air-conditioning units, equipment and apparatus at the Leased Premises and other fixtures such as ceiling tiles and grids, lighting fixtures, electric panel boxes, plumbing, boilers, floor and wall coverings, alarm systems, lights, toilet fixtures, partitions, doors, and utilities shall be deemed attached to the freehold and be Landlord's property.

---

[3] In the post trial brief, Express mentions refrigerators; however, Landlord's response indicates it is not contesting Express's right to the refrigerators. Dckt. No. 121, n. 3.

Pl.'s Ex. 1, Section 8(B) (emphasis added).    The Lease further states:

> **Surrender**.    At the expiration or sooner termination of the tenancy hereby created, Tenant shall peaceably leave and surrender the Leased Premises in broom-clean condition and the same condition as the Leased Premises were in upon delivery of possession thereof to Tenant, reasonable wear and tear excepted, . . . . <u>Prior to the expiration or sooner termination of this Lease, Tenant shall remove any and all trade fixtures, equipment, signage and other unattached items which Tenant may have installed, stored or left in the Leased Premises,</u> or elsewhere in the Shopping Center and <u>Tenant shall repair any damage caused by such removal.   Notwithstanding the foregoing, Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor coverings (including but not limited to wall-to-wall carpeting), walls or ceilings, all of which shall be deemed to constitute a part of the freehold and/or leasehold interest of Landlord, nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord (whether initially installed or replaced)</u>. . . .

<u>Id.</u> at Section 20(A)(emphasis added).

The Trustee did not assume the Lease during the chapter 7 proceedings; however, from the date of the Trustee's appointment through the sale date, the Trustee was operating the business pursuant to the Lease, and had obtained an extension of time to assume or reject the Lease until after the sale was consummated with

7

Express.[4] <u>In re Science Fitness, LLC.</u>, Chapter 7 Case No. 14-12297, Dckt. Nos.  307 and 308 (Bankr. S.D. Ga. Sept. 9, 2016); <u>see</u> 11 U.S.C. §365(d).

Mr. Simeone is Landlord's current manager.  He also previously served as manager of the former tenant, GH Evans.  At trial, Mr. Simeone testified Landlord built a new addition to the health club ("New Addition") in 2005 or 2006, after it purchased the shopping center in 2004.  Tr. 33:15-18; 34:1-5.  At that time, the Landlord installed the lockers and mirrors in the New Addition. According to Mr. Simeone:

> Behind the Presbyterian church is where the new locker room and all those facilities were installed [by Landlord].  The sauna, the equipment, all the lockers were purchased, and then the area in the back is where new mirrors were put up.  So there may have been a few mirrors--I don't know--that existed between Pro Fit and GH Evans, but I can testify that, substantially all the mirrors were replaced and the entire locker room is brand new at that point in 2006.

Tr. 34:11-21.

As for the other Disputed Items, Mr. Simeone was unsure which entity installed the T.V. stands and he further testified that

---

[4]    The sale from the Trustee to Express was consummated September 27, 2016; and the Trustee had until September 30, 2016 to assume or reject the Lease.    <u>In re Science Fitness, LLC.</u>, Chapter 7 Case No. 14-12297, Dckt. Nos.  307 and 308 (Bankr. S.D. Ga. Sept. 9, 2016); Pl. Ex. 5.

8

GH Evans did not install the sinks. Tr. 36:2-13. Mr. Simeone stated GH Evans never made any material improvements to the property while it was a tenant. Tr. 35:15-18. Mr. Simeone added that the Landlord did not sell any of the Disputed Items to GH Evans and therefore GH Evans could not have sold any of the Disputed Items to Debtor.[5] In addition, the Trustee did not think the Disputed Items were included in her sale to Express. See Webster v. Express, Ch. 7 Case No. 14-12297, Adv. Proceeding No. 16-01034, Dckt. No. 1 (Bankr. S.D. Ga. Sept. 29, 2016).

At trial, Mr. Hammonds, owner of Hammonds Construction Company, a commercial remodeling company that has remodeled many health clubs, testified that he was responsible for overseeing the removal of the mirrors and lockers for Express. He also made the repairs to the walls after their removal. Tr. 115:15-25. Mr. Hammonds testified to the ease of removal of the mirrors and how he has taken mirrors down many times when a gym closes or moves; stating the entire removal process takes less than 2 minutes per mirror. Tr. 105:5-15; Tr. 109:5-23; Tr. 112:2-25. He testified that when he has closed gyms in the past, the mirrors are usually removed and reused at another gym location. Tr. 109:10-23.

---

[5] Mr. Simeone has knowledge of the sale as he represented GH Evans and negotiated the terms of the sale of assets from GH Evans to Debtor when he was manager of GH Evans. Tr. 52:10-15.

9

Mr. Hammonds further testified that he was a partner in the prior tenant Pro Fit. He testified that on behalf of Pro Fit, he installed most of the mirrors in the gym at that time, but not all of them because Mr. Hammonds acknowledged Landlord added the New Addition long after Pro Fit's involvement at the site. Tr. 133:1-11; 133:23-25. He explained most of the mirrors were 5 ft X 100 and the largest mirrors are 5 ft X 120 and sit in a mirror channel, held in place with mastic/glue and safety clips. Tr. 108:16-21; Tr. 113:2-7; Tr. 134:10-13.

Furthermore, consistent with Mr. Simeone's testimony concerning the New Addition, Mr. Hammonds testified he did not install the lockers; rather, the lockers were installed by Landlord when it added the New Addition. Tr. 133:14-25.

Mr. Hogue, currently a consultant for Express and former co-owner of Debtor, testified that when Debtor bought GH Evans's assets he believed Debtor was purchasing the mirrors and lockers. Tr. 142:17-25; 143:1-12; Def.'s Ex. 2. The sale from GH Evans to Debtor was entered after Landlord built the New Addition. Mr. Hogue testified Debtor's purchase from GH Evans was a "turnkey" purchase, with Debtor thinking it purchased the lockers and mirrors. Tr. 143:4-9; 145:14-21. He testified he did not install the mirrors but he did replace mirrors that were broken. Tr. 162:3-4. This is

10

consistent with the terms of the Lease requiring the tenant to make repairs:

> Except as provided in subsection (A) above, all other portions of the Leased Premises shall be kept in good repair, condition and appearance by Tenant.  <u>Tenant shall maintain and make all repairs, replacements</u> and alterations of every kind with respect to the Leased Premises to <u>keep it in good condition</u>, including the storefront, <u>glass</u>, all interior and exterior doors, signs, ceilings, <u>interior walls</u>, interior side of perimeter walls, floor, floor coverings, plumbing, electric, heating and air conditioning . . . and do all repairs required by any laws, ordinances or requirements of public authorities . . . . All parts of the interior of the Leased Premises, including the storefront, shall be painted or otherwise decorated and refurbished (including, but not limited to, floor covering and wall covering) by Tenant as when reasonable necessary.

Pl. Ex. 1, Section 10(B)(emphasis added).

As to the sinks, Mr. Hogue explained that a juice bar was installed by a third party planning to operate a juice/smoothie bar for the gym patrons.  Tr. 148:13-19.  The third party ultimately backed out of the venture.  Tr. 148:20-24.  Debtor allowed the third party to leave the juice/smoothie bar with Debtor in return for Debtor not taking any action against the third party.  Tr. 148:24-25; 149:1-3.  There were two sinks associated with the juice bar. One sink was built into the cabinets; and the other is a plastic freestanding sink which was attached by plumbing for hot and cold

11

water and a drain, but is easily removable. Tr. 149:14-22.

The T.V. stands were described as arms that mount to a bracket on the wall and hold the television to the mount. Tr. 152:24-25; Tr. 153:1-6.

Mr. Montarbo, part-owner and operator of Express, was involved in the negotiations to purchase the assets from the Trustee. Tr. 171:15-21; Tr. 172:21-25. He testified that Express removed numerous items not expressly listed on the equipment list without objection by the Landlord, namely, couches, chairs, benches, and a pool table. Tr. 199:2-12. He stated he considered these items to be furniture. Tr. 194:5-7. He also testified that Express took the mirrors and lockers into account when it bid on the assets it purchased from the Trustee. Tr. 173:20-25; Tr. 174:1-9.

With this background, the Court must decide the ownership of the remaining Disputed Items. The parties acknowledge Landlord has the burden of proof on the issues at hand. Pretrial Order, Dckt. No. 104.

### CONCLUSIONS OF LAW

At issue is whether the Disputed Items--the mirrors, T.V. stands, and sinks--were sold to Express pursuant to the APA.[6] To

---

[6] Based upon the undisputed trial testimony that the lockers were installed by the Landlord and are located in the New Addition, the Court orally ruled at the conclusion of the trial that the

address this issue, the Court must determine whether Debtor had any rights in the Disputed Items as of the petition date. The Trustee could only sell items Debtor owned as of the petition date. See 11 U.S.C. §541(a)(defining property of the bankruptcy estate). If Debtor had an interest, the Court must then determine whether the Trustee sold the Disputed Items to Express.

**Mirrors**.

As an initial matter, it is undisputed that Landlord constructed the New Addition and installed the mirrors located therein. Given these facts, Express has no right to these mirrors, as the Debtor did not have an ownership interest in these mirrors as of the petition date. See 11 U.S.C. §541(a). While Debtor, or its predecessor, may have replaced or repaired some of these mirrors under the duty to repair in the Lease, the mirrors in the New Addition belong to Landlord and it is entitled to retain these mirrors. See Pl. Ex. 1, Section 10(B)(duty to repair).

**The Remaining Mirrors**.

It is unclear when the mirrors located outside the New Addition ("the Remaining Mirrors") were installed, and by whom. As a result, additional considerations must be made to determine the

---

lockers belong to Landlord for the same reasons set forth herein that the Court has concluded the mirrors located in the New Addition belong to the Landlord.

13

ownership of these items.   The Landlord contends the Remaining Mirrors are "wall coverings" belonging to Landlord under the terms of the Lease, regardless of who installed the mirrors.   The Lease states:

> all alterations, decorations, additions and improvements made by Tenant to the Leased Premises and including all heating and air-conditioning units, equipment and apparatus at the Leased Premises and other fixtures such as ceiling tiles and grids, lighting fixtures, electric panel boxes, plumbing, boilers, floor and <u>wall coverings</u>, alarm systems, lights, toilet fixtures, partitions, doors, and utilities <u>shall be deemed attached to the freehold and be Landlord's property</u>.

Pl. Ex. 1, Section 8(B) (emphasis added).

In support of its ownership claim, Landlord cites several cases involving non-Georgia law.   First, the Landlord cites the case of <u>U.S. E.P.A. v. New Orleans Public Serv., Inc.</u>, 826 F.2d 361, 366 (5th Cir. 1987) which made the statement:

> [i]mmovables by destination . . . were items which were so closely associated with an immovable that they were considered permanent parts thereof, without regard to the ease with which they could be removed.   <u>Thus, wall coverings such as mirrors</u> and marble wainscoting were deemed to be permanent attachments, hence immovables by destination.

<u>U.S. E.P.A. v. New Orleans Pub. Serv., Inc.</u>, 826 F.2d at 366 (emphasis added).   The Fifth Circuit did not provide an in depth analysis of what constitutes a wall covering, but cited <u>Mackie v.</u>

14

Smith, 1850 WL 4075, at *1 (La. Nov. 1, 1850), which held that mirrors set in four and a half-inch deep recesses in the wall were immovables under Louisiana law. Mackie v. Smith, 1850 WL 4075 at *1. In another case, Gauche Realty Co. v. Janssen, 104 So. 122 (La. 1925), marble wainscoting, which extended around the walls in a restaurant and attached to the wall by plaster and copper hooks was a wall covering because its removal left the walls rough and unfinished. In that instance, the court concluded it was clear that the marble wainscoting was intended to be a permanent finish to the walls. Gauche Realty Co. v. Janssen, 104 So. at 123; see also New York Life Ins. Co. v. Allison, 107 F. 179, 185 (2nd Cir. 1901)(applying New York law and concluding mirrors set into wooden panel frames embedded in the plastering of the walls whose removal left the wall unfinished and dismantled in appearance were intended to be permanent fixtures).

First, in determining whether the Remaining Mirrors are a fixture or personalty, the Court must look to applicable state law, which, in this case, is Georgia law. Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law."). Therefore, while the cases cited by the Landlord may be helpful, they are not controlling.

15

Second, the cases cited by Landlord are factually distinguishable from the matter currently before the Court. In the Landlord's wall covering cases, the walls actually had recesses or embedded wooden frames in plaster for the mirrors/wainscoting. The walls were adapted especially for the placement of the mirrors/wainscoting and it was clear the mirrors/wainscoting were intended to be the permanent finish to the wall. Conversely, in the current case, the walls were not especially adapted for the Remaining Mirrors to fit and there is no special paneling or frames set into the walls. From pictures and testimony, it is clear these mirrors are wall to wall mirrors common in gyms. While the mirrors are very large, covering most of the wall (floor to ceiling), and affixed to the walls by mastic/glue and safety clips, the undisputed testimony from Mr. Hammonds is that they are easily and quickly detachable. Tr. 165:8-17; Def.'s Exs. 5-7; Pl's Ex. 8. The mirror channel, mastic/glue, and the clips are safety features to prevent the mirror from falling and shattering if they are broken. Tr. 108:16-21; 113:1-25; 114:1-12. It also is clear that while removing the mirrors does damage the walls, the damage is mostly cosmetic and easily repairable. Tr. 128:1-13. In addition, Mr. Hammonds testified that most of the time when a gym closes the mirrors are removed and used at the new location. Tr. 109:10-23. Given the

16

facts of this case, the Court finds the mirrors are not "wall coverings" under the terms of the Lease.

Express argues the Remaining Mirrors are personalty and/or trade fixtures it purchased from the Trustee pursuant to the APA. Express contends its predecessor in title, Pro Fit, installed the Remaining Mirrors and each successor tenant purchased the mirrors pursuant to the terms of the respective asset purchase agreements and bills of sales--GH Evans purchased from Pro Fit; Debtor purchased from GH Evans; and Express purchased from the Trustee.

Mirrors generally are considered personal property. See Black's Law Dictionary (10th ed. 2014)(defining "personal property" as "any movable or intangible thing that is subject to ownership and not classified as real property"). The Court must decide if the Remaining Mirrors became fixtures through the process of their affixation to the walls.

Pursuant to Georgia law:

> (a) Anything which is intended to remain permanently in its place even if it is not actually attached to the land is a fixture which constitutes a part of the realty and passes with it.

O.C.G.A. §44-1-6. As Pindar's explains:

> A fixture may be broadly defined as any article or thing which, though originally a chattel, becomes through the process of annexation or attachment, a part of the realty. The term

17

> includes anything intended to remain
> permanently in its place whether or not
> physically attached . . . . The term fixture
> can also be used to describe things which stand
> on the borderline between the two categories of
> personalty and realty as to which it must be
> decided whether the particular relationships of
> the landowner and the chattel claimant or
> lienholder require its treatment as one or the
> other.

Pindar's Georgia Real Estate Law and Procedure, §10:1 (2018).

Under Georgia law, the determination of whether an item has become a fixture or remains personalty is a fact intensive, multi-factor analysis. In re Smith, 2008 WL 7390623, at *2 (Bankr. S.D. Ga. Oct. 24, 2008); In re Janmar, Inc., 4 B.R. 4, 9 (Bankr. N.D. Ga. 1979). The factors to consider are set forth by the Georgia Supreme Court in Wolff v. Sampson, 51 S.E. 335, 336 (Ga. 1905), which provides:

> Whether an article of personalty connected with
> or attached to realty becomes a part of the
> realty, and therefore such a fixture that it
> cannot be removed therefrom, depends upon the
> circumstances under which the article was
> placed upon the realty, the uses to which it is
> adapted, and the parties who are at issue as to
> whether such an article is realty or detachable
> personalty.

Wolff, 51 S.E. 335-36.

In this case, the circumstances under which the Remaining Mirrors were installed is unclear. While some of the mirrors may have been repaired or replaced by various tenants, Mr. Simeone

18

claims "substantially all" the mirrors were installed by Landlord. Tr. 34:14-18. Mr. Hammonds also testified credibly that when he was an owner of the tenant, Pro Fit, he installed mirrors in the gym for Pro Fit. Tr. 133:1-11; 133:23-25. This installation was before the New Addition was constructed so the issue is whether the parties intended the Remaining Mirrors to be permanent as opposed to easily removable. When intent is unclear, Courts may look to the ease of removal to discern the intent of the parties. See In re Smith, 2008 WL 7390623, at *3(detachability has been a determinative factor when intent of parties is difficult to discern). In this case, the Remaining Mirrors are easily detachable with minimal damage to the walls.

Under the Wolff test, courts also consider the use in determining the nature of the item. Mirrors are common in gyms, allowing patrons to monitor their form and surroundings. The mirrors are not just decorative; they serve a purpose for gym patrons. However, the mirrors do not serve the purpose for which the building was erected. See In re Smith, 2008 WL 7390623, at *5 (stating items of personalty with a functional, essential purpose attached to realty will be considered fixtures and holding a chandelier is not essential to a residential purpose). According to the pleadings and testimony, the building was initially used as a

19

grocery store with accompanying retail/office space. Tr. 32:6-8; 33:22; Dckt. No. 121, p. 2. Over the years, portions of the building have been rented to a variety of tenants, including a karate studio, a gym, a church, and a driver's license bureau. Tr. 32:6-8; 33:22. Retail/office space can be transformed to meet the particular needs of a tenant, but, the Remaining Mirrors do not serve an essential purpose for which the building itself was erected.

Based upon the intent of the parties, the ease of detachment, and the use and purpose of the Remaining Mirrors, I conclude the mirrors are not fixtures.

Furthermore, even if these Remaining Mirrors are deemed fixtures, the Court concludes they are "trade fixtures" installed by a prior tenant which are removable by the tenant under the terms of the Lease, and therefore Debtor, not Landlord, has an ownership interest. "Trade fixtures are defined as articles annexed to the realty by a tenant for the purpose of carrying on a trade." Lay Bros. Inc. v. Golden Pantry Food Stores, Inc., 616 S.E.2d 160, 164 (Ga. Ct. App. 2005). As previously discussed, the Remaining Mirrors were attached to the walls, which is common in health clubs for the purpose of carrying out the gym's business. Removal of the Remaining Mirrors does not cause substantial damage to the freehold.

20

Furthermore, the Lease allows the removal of trade fixtures:

> Except for signs, merchandise counters or <u>other</u> <u>easily removable similar trade fixtures</u> <u>installed by Tenant at Tenant's expense</u>, all alterations, decorations, additions and improvements made by Tenant to the Leased Premises and including all heating and air-conditioning units, equipment and apparatus at the Leased Premises and other fixtures such as ceiling tiles and grids, lighting fixtures, electric panel boxes, plumbing, boilers, floor and wall coverings, alarm systems, lights, toilet fixtures, partitions, doors, and utilities shall be deemed attached to the freehold and be Landlord's property.

Pl.'s Ex. 1, Section 8(B) (emphasis added). This indicates the intent of the parties that trade fixtures are not to become part of the real property.

In addition, the parties have stipulated the Landlord has the burden of proof and the Court concludes the Landlord has failed to establish that the Remaining Mirrors were not installed by a tenant and do not constitute trade fixtures. Prior to Landlord's purchase of the real property, Mr. Hammonds installed the Remaining Mirrors on behalf of the tenant, Pro Fit. Also, before Landlord purchased the real property, the Remaining Mirrors were purchased by GH Evans from Pro Fit. GH Evans purchased all of Pro Fit's:

> right title and interest in, to and under the assets, properties, improvements and business owned, held or used in the conduct of the Business by [Pro Fit] as same are constituted on the Closing Date including . . . all other

21

> personal property and interests therein,
> including gym equipment, machinery, equipment,
> computers, furniture, fixtures, vehicles and
> other tangible property owned or leased by [Pro
> Fit] and utilized in the operation of the
> Business . . . . Def. Ex. 1 (emphasis added).
> Thereafter, pursuant to the asset purchase
> agreement between GH Evans and Debtor, Debtor
> purchased "all furniture, equipment (to include
> exercise equipment), computers, machinery,
> fixtures, assets, accounts receivable . . ." of
> GH Evans.

Def. Ex. 2 (emphasis added). The respective tenants sold the

Remaining Mirrors to each successor tenant through the various asset

purchase agreements and accompanying bills of sales. The leases

between these successive tenants and Landlord did not change this

ownership. For these reasons, the Court finds that even if the

Remaining Mirrors are fixtures, they are trade fixtures and the

tenants, not the landlord, had an ownership interest in the

Remaining Mirrors.

### The Trustee's Conveyance to Express.

Next, the Court must determine if the Trustee conveyed the

Remaining Mirrors to Express. Pursuant to the APA, Express

purchased Debtor's right, title, and interest in the following:

> all accounts, contract rights, membership
> agreements, personal training contracts,
> contracts and all accounts receivable through
> ABC Financial and ClubReady, furniture,
> furnishings, equipment, inventory, intellectual
> property required for the operation of the
> Debtor's business, goods held for sale,

22

AO 72A

(Rev. 8/82)

> supplies and other materials used or consumed
> in the Debtor's business.  A copy of the
> equipment list is attached and incorporated
> into this Agreement.

Pl. Ex. 5.   The Bill of Sale conveyed the following items to

Express:

> all accounts, contract rights, membership
> agreements, personal training contracts,
> contracts and all accounts receivable through
> ABC Financial and Clubready, furniture,
> furnishings, equipment, inventory, intellectual
> property required for the operation of the
> Debtor's business, goods held for sale,
> supplies and other materials used or consumed
> in the Debtor's business.  A copy of the
> equipment list is attached as Exhibit "A" and
> incorporated into this Final Closing Statement.

Pl. Ex. 6.

Although, the Remaining Mirrors are not expressly listed

on the equipment list, for the reasons discussed herein, the

Remaining Mirrors are furnishings and equipment used in Debtor's

business.   Furthermore, Mr. Montarbo also provided undisputed

testimony that Express removed numerous items not expressly listed

on the equipment list without objection by the Landlord, namely,

couches, chairs, benches, and a pool table.  Tr. 199:2-12; see Dckt.

No. 92, p. 18; Webster v. Express, Ch. 7 Case No. 14-12297, Adv.

Proceeding No. 16-01034, Dckt. No. 78, p. 11 (Bankr. S.D. Ga. Sept.

28, 2017)("Montarbo [Express's business manager] avers items not

listed on Exhibit 'A' [of the Bill of Sale] were removed by Express

23

as part of the sale without objection from the Trustee or Landlord
. . . . There were couches, oversized leather chairs, benches to sit
on in front of the lockers in the men's locker room a pool table.
In the women's locker room there were massaging chairs.  These items
were not on the equipment list but were removed without
objection.").

For these reasons, the Court concludes that the terms
"furniture," "furnishings" and "materials used or consumed in
Debtor's business" are listed as separate and distinct categories
from "equipment" and therefore the terms have separate and distinct
meanings.  See Webster v. Express, Ch. 7 Case No. 14-12297, Adv.
Proceeding No. 16-01034, Dckt. No. 78, p. 10-11 (Bankr. S.D. Ga.
Sept. 28, 2017); see also Chung v. JPMorgan Chase Bank, N.A., 975 F.
Supp. 2d 1333, ("under Georgia law, contracts should be interpreted
so as to not render any part superfluous) (citing Harris County v.
Penton, 439 S.E.2d 729 (Ga. Ct. App. 1993)("In construing contracts,
Georgia law requires us to give meaning to every term rather than
construe any term as meaningless.")).  Therefore, given these facts,
and the Landlord's burden of proof, the Remaining Mirrors were sold
to Express as "furniture," "furnishings" and "materials used or
consumed in Debtor's business."

24

**<u>Sinks</u>**.

Two sinks also remain in dispute.  One is a freestanding plastic sink on four legs and the other is set into the counter. Landlord argues both sinks are "plumbing fixtures" which under paragraph 8 of the Lease belong to Landlord.  In support, Landlord points out that O.C.G.A. §8-2-3 defines "plumbing fixture" "as used in this Code section" as "a device that receives water, waste, or both and discharges the water, waste, or both into a drainage system.  The term includes a kitchen sink, utility sink, lavatory, bidet, bathtub, shower, urinal, toilet, water closet, or drinking water fountain." O.C.G.A. §8-2-3.  This definition, while helpful, only defines terms "as used in this Code section" which is the Georgia Building Code, and therefore the Court must still apply the traditional <u>Wolff</u> test to determine whether the sinks are fixtures.

According to the testimony, Debtor acquired both sinks as settlement with the initial third party owner who backed out of the juice bar deal with Debtor.  According to Mr. Hogue, the freestanding plastic sink is attachable to hot and cold water and a drain, similar to how a washing machine attaches to two spigots. Tr. 22:20-24; Tr. 149:14-25.  It is made to be very mobile.  Under the fact-intensive analysis of <u>Wolff</u>, the freestanding sink is not a fixture given its ease of detachment, and no evidence that removal

25

damages the premises. Furthermore, as with the mirrors, the freestanding sink's usage does not serve the essential purpose for which the building was erected. Based upon these factors, the Court finds the freestanding sink is not a fixture and it was conveyed to Express as a "furnishing" or "equipment" under the terms of the APA and Bill of Sale as previously discussed.

Conversely, a sink built in the cabinet is more permanent and is a fixture and therefore belongs to the Landlord, even if installed on behalf of Debtor by a third party. See e.g. Morrison, Inc. v. Comm'r of Internal Revenue, 891 F.2d 857, 861 (11th Cir. 1990)(finding hand sinks bolted to the walls, designed to remain permanently in place, and difficult to remove are not personalty rather they are structural components); In re Janmar, Inc., 4 B.R. 4, 9 (Bankr. N.D. Ga. 1979)(finding the parties intended the sinks to permanently affixed to the realty and thus fixtures); Pl. Ex. 1, Section 8(B).

**T.V. Stands**.

There was little testimony as to the installation or initial ownership of the T.V. stands. There also was no testimony regarding any damage caused by removal. Given that Landlord has the burden of proof on this issue, the T.V. stands belong to Express as furnishings under the APA and Bill of Sale. See First Fed. Sav. and

26

Loan Ass'n v. Stovall, 289 So.2d 32, 33 (Fla. Dist. Ct. App. 1974)(lack of evidence of intent requires finding sinks are personalty).

### CONCLUSION

For the foregoing reasons, it is therefore ORDERED that (i) the lockers[7] and mirrors located in the New Addition, and the sink built in the cabinet belong to Landlord; (ii) the Remaining Mirrors, the freestanding sink, the T.V. stands, and refrigerators[8] belong to Express. The Clerk is directed to set a status conference on the next available adversary court date to address the trial on damages.[9]

_Susan D. Barrett_

SUSAN D. BARRETT
UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia
this __1st__ Day of February 2019.

---

[7]   See n. 6 supra.

[8]   See n. 3 supra.

[9]   According to Mr. Simeone's testimony, the mirrors that were being stored by Landlord pursuant to this Court's order have been stolen.   Tr. 70:10-24; 80:1-22.

27

AO 72A

(Rev. 8/82)